## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## CIVIL DIVISION

**TIFFANI BRAZELL,**

  **Plaintiff,**

**v.**           **Case No: 8:20-cv-485-T-24AEP**

**HILLSBOROUGH COUNTY BOARD**
**OF COUNTY COMMISSIONERS,**

  **Defendant.**

_____/

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Tiffani Brazell ("Plaintiff" or "Brazell"), by and through the undersigned counsel, hereby moves for partial summary judgment and requests that the Court find, as a matter of law, that Defendant Hillsborough County Board of County Commissioners ("Defendant" or "the County") retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and the Florida Civil Rights Act of 1992, §760.01, *et seq*., Fla. Stat. ("FCRA") when, following her complaint of sexual harassment and criticism regarding how it was handled, the County conditioned her continued employment upon Brazell's agreeing to execute a waiver and release of her claims under these laws.  Plaintiff seeks summary judgment only as to her retaliation claims – Counts III and IV of her Complaint [Doc. 1] and as to liability only.  The undisputed evidence shows that the County engaged in unlawful retaliation and an entry of summary judgment on that issue will narrow the remaining issues for a jury to consider at trial.  In support of this motion, Plaintiff offers the following Statement of Undisputed Facts and Memorandum of Law.

## STATEMENT OF UNDISPUTED FACTS

**I.      Background Information**

Matthew Stewart was a Human Resources Manager for the employees under Hillsborough County Board of County Commissioners.  [Exhibit 1 – Deposition of Matthew Stewart 33:21-23]. [1]   He was responsible for employee relations, discipline, performance management, and employee engagement.  [Stewart 34:10-16].  Erica Herrera is a Human Resources Partner at Hillsborough County.  [Exhibit 2 – Deposition of Erica Herrera 13:15-22].  In 2019, Herrera had human resources responsibility with the Parks and Recreation Department.  [Herrera 14:17-15:21].  Herrera reported to Stewart until his resignation. [Herrera 24:1-6].  Beverly Waldron was the Director of Human Resources at Hillsborough County.  [Exhibit 3 – Deposition of Beverly Waldron 6:1-4].  Waldron retired on October 31, 2019.  [Waldron 9:3-4].

Plaintiff first began working for the Parks Department, supervising children, when she graduated from high school in 2015, prior to leaving for college.  [Exhibit 4 – Deposition of Tiffani Brazell 28:25-30:4].  She testified how much she loved this job because she had grown up in the Parks Department:

> Q      So did you feel that you found your niche in your job with the parks?
> A      Yes.
> Q      And so why, what caused you to want to go to work for Hillsborough County Parks?
> A      Parks have been my whole life.

[Brazell 25:18-23].  After a year of college, Brazell returned to the Parks Department in a part time position at the same location.  [Brazell 34:15-35:11].  At the end of the summer, Brazell was transferred to the Jackson Springs location.  [Brazell 38:15-39:4].  She was still a part-

---

[1]      Deposition testimony will be cited using the last name of the deponent, followed by the page and line number or exhibit number.

time employee.  [Brazell 40:3-5].  Brazell applied for a full-time position at Jackson Springs and worked as a full-time employee for more than a year before being transferred to the Northdale location, where she worked until her employment ended.  [Brazell 41:8-19].

During her employment, Brazell was never required to drive as part of her job.  [Brazell 65:15-18; 68:14-19].  During her first employment period, when Brazell picked kids up from school, she did so by walking with them, not driving.  [Brazell 30:5-31:1].  Brazell testified that she does not recall ever driving kids during her employment.  [Brazell 91:9-11].

## II.     Plaintiff Was the Victim of Sexual Harassment by Her Supervisor.

At Jackson Springs, Brazell's supervisor was Wayne Mayweather.  [Brazell 45:16-46:3].  Mayweather repeatedly tried to get Brazell alone and away from the cameras, which made Brazell uncomfortable.  [Brazell 48:2-15]. Mayweather told Brazell he needed her phone number as her supervisor and then began calling her "pretty often."  [Brazell 49:17-50:9].  When he would call just to talk, Brazell would say she did not want to talk and they can talk at work.  [Brazell 50:10-17].  Although Brazell was clear, Mayweather continued.  [Brazell 50:15-19].  Mayweather made sexual, vulgar comments to Brazell, culminating in one where he said "he was going to fuck [Brazell] with his big black dick where there weren't cameras."  [Brazell 48:21-49:2].  He also told another employee when Brazell dropped her keys that she "better not drop them keys in front of me," which was construed to be of a sexual nature.  [Brazell 59:19-60:22].  Brazell reported these comments to a supervisor, Adrienne Rouse.  [Brazell 51:11-18].  Brazell then went to HR and they investigated.  [Brazell 53:1-8].  Unbeknownst to Brazell at the time, Mayweather was placed on a three-month leave before returning to work at a different location.  [Brazell 53:9-54:11].  Brazell still saw Mayweather at meetings on several occasions.  [Brazell 54:12-19].  Brazell only found out about

Mayweather's leave and reassignment after she asked for a follow-up meeting.  [Brazell 55:21-56:2].  Brazell thought there was a zero-tolerance policy and was disappointed in the result of the County's investigation.  [Brazell 56:3-14].

Stewart became aware of Brazell when she raised concerns about sexual harassment in September 2017.  [Stewart 37:25-38:19].  Stewart claims he was not involved in the original investigation.  [Stewart 40:10-13].  Likewise, Herrera did not have any involvement in the original sexual harassment investigation.  [Herrera 19:16-22].

Brazell's complaints of sexual harassment were sustained.  [Stewart 44:19-22].  The County's investigation concluded that Brazell's harasser had violated County policy by sexually harassing her.  [Herrera 68:6-16].  Stewart was involved in the decision to demote Brazell's harasser.  [Stewart 41:2-13].

### III.   Plaintiff Began Expressing Concerns Regarding the Handling of her Sexual Harassment Complaint.

In 2018, Brazell, Stewart, Herrera, and someone from the County Attorney's Office attended a meeting where Brazell stated she was unhappy about the outcome of the sexual harassment complaint, that she was upset that she had run into her harasser at a meeting, and that she was concerned no one told her that she would potentially be encountering him again. [Stewart 42:13-23; Herrera 27:8-28:2].  Brazell was not happy with the corrective action – demotion – and she was concerned with having to continue to see him at work.  [Herrera 28:3-17; 29:1-4].  Brazell was concerned that the County had not done enough in response to her sexual harassment complaint.  [Herrera 29:5-9].

No actions were taken as a result of Brazell raising these concerns at this meeting in 2018.  [Herrera 28:18-25].

4

IV.  **Brazell's License Was Suspended and She Was Given a Business Purposes Only License.**

On November 11, 2018, Brazell was involved in an accident, refused a breathalyzer, and was arrested and charged with driving under the influence, ultimately pleading guilty to a charge of reckless driving.  [Brazell 70:1-79:19].

Within a day or two of the incident, Brazell received her business purposes only license. [Brazell 81:14-18].  Brazell informed the County about the status of her license.  [Brazell 82:9-14].  Brazell had a conversation about the accident with HR and, when asked, she told them that she did not drive as part of her job.  [Herrera 34:1-16].  In May 2019, Herrera recalls learning that Brazell had a business purposes only license.  [Herrera 34:21-35:7].  Herrera understood that Brazell's charge had been reduced to reckless driving and that her license would remain suspended for a year following the accident because she refused the breathalyzer.  [Herrera 35:24-36:5].

Brazell met with Herrera and Stewart who asked her about the license and when she would get her regular license back.  [Brazell 84:11-22].  They did not express any concerns over her possession of a business purposes only license.  [Brazell 84:23-85:2].  The business purposes license legally permitted Brazell to drive to a meeting or to another location while working.  [Brazell 92:24-93:8].

V.  **The County Conditioned Brazell's Continued Employment on a Release of her Title VII and FCRA Claims**

Herrera and Stewart came up with the idea of having Brazell sign a Waiver and Release as a way to have some assurances of when Brazell would again meet the minimum qualifications of her job by holding a regular driver's license.  [Herrera 42:12-43:16].  The Waiver and Release "would allow her to keep her job through November…in exchange for

executing the Waiver and Release." [Herrera 45:2-4]. The agreement contemplated that if she did not have her license back by the date in the agreement, Brazell would resign her employment. [Herrera 45:6-8]. If Brazell would not sign that agreement, the next step would be to go to the predisciplinary hearing and impose discipline. [Herrera 45:15-19]. Brazell could also keep her job by meeting the qualifications, which is holding a license that would allow her to operate County vehicles. [Herrera 47:4-10].

The Agreement contained a waiver and release of claims Brazell could bring against the County, including under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act. [Herrera 46:11-47:3]. Herrera was aware of Brazell's past sexual harassment complaint at the time Brazell was presented with the Waiver and Release and understood that Brazell would be waiving any claims that she had against the County up to that point. [Herrera 73:19-74:19].

Stewart testified that Brazell was presented with this Waiver and Release so that the County "would know that by a certain date and time she would actually have the license back, or that her employment would end." [Stewart 60:15-61:18]. However, Stewart understood that this Waiver and Release would waive Brazell's ability to bring claims against the County, including any claims associated with sexual harassment, which Stewart knew Brazell had. [Stewart 61:19-62:1].

> Q   But the Release document that was presented to her didn't just say that, it also said you need to agree not a sue us under Title VII and all of the other civil rights laws, correct?
> A   Yes, sir.
> Q   Okay. And Ms. Brazell had previously brought forth claims of discrimination against the County and sexual harassment associated with her supervisor, correct?
> A   Yes, sir.
> Q   And those were sustained.

> A      To the best of my knowledge, yes, without seeing the document. Yes, sir.

[Stewart 88:13-25].

Brazell's employment was contingent on signing this Wavier and Release, meaning she could sign it or she would be terminated: "If she wasn't going to sign the Waiver and she couldn't guarantee us a date, the only other option available to the County was dismissal." [Stewart 98:13-15]. In fact, as noted below, this is the result that occurred: "Because she didn't enter into the Waiver and Release we rendered the decision from the hearing, which was separation." [Stewart 103:11-14].

If Brazell had signed the Waiver and had her license reinstated by the date expected (which she did), her employment would not have been terminated. [Stewart 103:17-22].

> Q      Assume for the purpose of this question that she got her license at the earliest possible date which was before the date that the County said they needed proof of it by.
> A      Yes.
> Q      If she had signed the Waiver and Release she would have still been employed by the County, correct?
> A      Yes, sir.

[Stewart 104:24-105:10].

When Brazell was presented with the Waiver and Release in August 2019, she declined to sign it. [Herrera 48:22-25]. In her email declining to sign this Waiver and Release, Brazell stated that she does meet the minimum qualifications (explaining that her business purposes only license is still a "valid Florida Driver's License" with restrictions), explaining that she does not drive as part of her job, and, to the extent she needs to drive for her job, asking for written permission from the County Administrator to drive pursuant to County policy, which would have allowed her to meet the minimum qualifications HR was articulating. [Herrera Ex. 1].

7

**VI.**   **The County Has a Pattern and Practice of Presenting Employees with a Waiver and Release in Retaliation for Raising Concerns of Discrimination and Harassment.**

Subsequent to Brazell's termination, Stewart himself "raised multiple concerns regarding some possible discrimination within the Human Resources Department." [Stewart 18:1-8]. Specifically, he raised concerns that two of his peers were "paid inequitably possibly based on protected status characteristics." [Stewart 24:11-18]. Stewart believes he was placed on a special project and presented with a Waiver and Release in retaliation for raising these concerns. [Stewart 18:18-22; 18:14-22]. The County was explicit that Stewart would need to sign a Waiver and Release or he would be terminated. [Stewart 22:17-23:2; 28:14-18]. Stewart does not believe the County ever investigated the concerns of pay inequity he raised. [Stewart 29:2-6].

**VII.**   **Brazell's Requests for the County Administrator to Approve Her Use of Her Business Purposes Only License Were Ignored.**

County policy states that "[a]n employee whose driving privileges are suspended for DUI under FS322.2615 may not drive on County business. An employee, upon being issued a license for "business or employment purposes only "…may not drive without the written permission of the County Administrator. [Herrera Ex. 2].

Brazell explicitly asked her supervisors and HR for the written permission contemplated by this policy. [Stewart 56:16-19; Herrera Ex. 1].

Despite this request, Stewart does not recall anyone asking the County Administrator for this permission. [Stewart 55:8-56:15]. Instead, Herrera testified that they "had a number of conversations around whether or not an employee should be permitted to drive with a business purpose only" license and they "concluded that there was just too much risk to the County to allow an employee to drive under such circumstances." [Herrera 53:1-9]. Herrera

did not speak with the County Administrator following Brazell's request for written permission to drive.  [Herrera 54:10-12].  Herrera is unaware of any County policy that provides her with the discretion to make decisions on behalf of the County Administrator.  [Herrera 58:10-14].  Brazell's request for this written permission – the only way she could comply with what they were asking of her other than signing the Waiver and Release – was completely ignored:

> Q       So Ms. Brazell contacted the two persons from Human Resources and two persons in her chain of command asking that written permission be granted pursuant to County policy, correct?
> A       It looked like from the email that you showed that she was asking for that written permission.
> Q       Okay. And, to your knowledge, no one at the County bothered to do anything about that request, correct?
> A       I personally did not go seek an exception from the County Administrator and, to my knowledge, no one else did either.
> Q       Okay. And no one even brought it up with the County Administrator, is that your testimony?
> A        I did not. And, to my knowledge, I don't – I'm not aware of any conversation with the County Administrator around this case.
> Q       And were there any conversations with any Deputy County Administrators about this case?
> A       Not to my knowledge.

[Herrera 59:1-21].  Waldron was unaware that Brazell even made a request that the County Administrator allow her to drive with a business purposes only license.  [Waldron 23:-7-10; 24:21-24].

In fact, no one in HR seems to understand how this permission is even sought or did anything to find out what that process is: Herrera is not sure what the process is to request the County Administrator approve her business purposes only license, but understands this is something that can be done.  [Herrera 49:4-50:13].  Herrera does not know "what the protocol would be to get written permission."  [Herrera 61:13-19].  She did not try to figure out what the protocol is when Brazell asked.  [Herrera 62:11-18].  Even Waldron, Director of HR at the time, is not aware of any specific procedure for making this request.  [Waldron 24:17-20].

Meanwhile, Brazell was not informed that no one would be seeking the written permission she had requested.  [Herrera 60:17-21].  Brazell was not told that her request was deficient.  [Herrera 62:20-22].

**VIII.** **For Ten Months, Brazell Successfully Performed Her Job with Her Business Purposes Only License.**

Brazell repeatedly told the County that it was her intention to get her license restored as soon as she could, and she had told the County this from the beginning.  [Herrera 65:23-66:7].  Brazell told Stewart that her standard driver's license would be reinstated on November 11, 2019.  [Stewart 59:9-19].

For the ten months prior to her termination, Brazell had continued to do her job while holding the business purposes only license.  [Herrera 66:8-16].  Although Waldron, the decision-maker in Brazell's termination, testified that it would surprise her to learn that Brazell did the job for approximately 10 months with a business purposes only license, Brazell had been performing her duties successfully with a driver's license in a business purposes status for ten months.  [Waldron 22:17-24; Stewart 76:10-14; 84:23-25].  While all of this is going on – the meetings, the discussion about the Waiver and Release, Brazell's attempt to get the written permission to use her business purposes only license – Brazell was performing her job duties while possessing a business purposes only license and Herrera is unaware of any impact that had on County operations.  [Herrera 37:8-38:2].

**IX.** **At Her Pre-Disciplinary Hearing, Prior to Her Termination, Brazell Continued to Express Concerns Regarding Retaliation.**

Subsequent to her first refusal to sign the Waiver and the Release, the County had proceeded with the pre-disciplinary process.  [Herrera 64:9-15].  Brazell's pre-disciplinary hearing was on September 9, 2019.  [Stewart 85:1-4]. Brazell again raised concerns she had

made previously that male employees who had had DUIs were not subjected to these same requirements.  [Stewart 73:16-74:5].  There were other County employees in the same job who lost their license due to DUIs who were allowed to continue to work.  [Brazell 107:24-108:22]. She specifically stated that she felt targeted by Human Resources and Matthew Stewart. [Herrera 81:1-8].  At the pre-disciplinary hearing, Brazell presented a written statement which stated that she felt that she was the victim of retaliation.  [Herrera 77:5-17].

In addition to outlining her love for her job in the Parks Department she had grown up in and expressing regret for the decisions that led to her accident and arrest, she expressed frustration that she had done everything that had been asked of her and was still being subjected to discipline and Brazell raised concerns that she was being bullied and targeted by Human Resources and that she believes this may be retaliation for her continued persistence and questioning of how HR handled her sexual harassment complaint.  [Stewart 66:10-21; Ex. 3]. Specifically, she stated:

> I would also like to mention that I feel that I am being bullied and targeted by Human Resources on this matter.  I am aware that others within the Parks and Recreation department have been faced with situations where their license was suspended for a period of time for similar circumstances – and were never rigorously sought after or had to face any consequences in respect to their employment.  Is it common practice for HR to pick and choose who they decide to discipline?

> My interactions with HR started when I approached HR with a sexual harassment complaint.  HR took an entire year to investigate and process this complaint [sic] and admittedly acknowledged that HR did not manage the complaint properly, timely, or in accordance with County policies.   The outcome of the other individual ended in suspension WITH PAY for two months, and having this individual transferred to another county department. Matt Stewart of HR was the individual handling this case.  I have truly felt bullied and targeted through this situation regarding my license, possibly as a sort of retaliation for my continued persistence and questioning of how HR handled my sexual harassment complaint?

[Herrera Ex. 3, p. 3-4].

No investigation into these claims of retaliation was conducted, despite County policy requiring such investigations [Stewart 67:22-67:8].  Herrera did not take any action as a result of this claim nor did she flag it for the Human Resources Director who she passed the matter onto.  [Herrera 78:1-5; 82:16-83:8]. At her pre-disciplinary hearing, Stewart testified that Brazell's claims should have triggered "at least a review of the claim to see what type of investigation was required," but this did not happen. [Stewart 68:11-23].

**X.**     **Rather than Investigate Her Concerns, The County Terminated Brazell Less than Two Months Before Her License Was Due to be Reinstated Because She Would Not Waive Her Claims under Title VII and the FCRA.**

After the pre-disciplinary hearing – where Brazell again expressed her concerns that she was being retaliated against due to her sexual harassment complaint and frustration with how it was handled – the County presented Brazell with another Waiver and Release.  [Herrera 64:16-18].  The County altered the agreement to address a concern about the timing of Brazell's license reinstatement.  [Herrera 64:19-65:12].   The provisions requiring her to waive her ability to bring claims under Title VII and the FCRA remained.  [Herrera 65:13-22].

Thus, the County was willing to allow Brazell to work without the valid license for a full year until she got her license back in November, but she had to sign the Waiver and Release in order to keep her job.  [Herrera 13-22; Stewart 76:15-77:3; 87:23-88:2].

Herrera testified that if Brazell signed the Waiver and Release, she would have kept her job until the point in time she was expected to get her license back and if she got her license back, she would have kept her job (absent some other incident or issue).  [Herrera 106:18-107:3].  Likewise, Stewart testified that if Brazell had signed the Waiver and Release, she would have continued to work for the County. [Stewart 72:19-73:3].

To keep her job, Brazell wanted to sign the Waiver and Release while also stating that she was under duress or under pressure and the County Attorney's office refused.  [Stewart 69:13-70:9].  The County did not accept that signature and instead issued the determination for the pre-disciplinary hearing.  [Stewart 72:11-16].

When Brazell did not sign the Waiver and Release, she was terminated on September 20, 2019.  [Stewart 69:7-10; Stewart Ex. 4].  Waldron – the decision maker – was told that Brazell was offered a Waiver and Release and had chosen not to sign it.  [Herrera 88:15-18].[2]

Brazell testified that it was her refusal to sign the Waiver and Release that led to her termination.  [Brazell 125:6-14].

> Q    When you were told there would be some form of discipline, did HR representatives tell you that the reason for the discipline is that you did not yet have your driver's license?
> A    The reason for the discipline was because I didn't sign the waiver and release.
> Q    And that's what you were told?
> A    Yes.
> Q    Who told you this?
> A    Matt Stewart and Erica Herrera.

[Brazell 105:11-22].  At this point, Brazell understood that even if she had magically gotten her license back on that day (which was legally impossible), she would still need to sign the Waiver and Release to keep her job.  [Brazell 106:13-20].

---

[2]     Waldron has no specific recollection of conversations leading up to Brazell's termination.   [Waldron 18:16-23; 28:5-11].  Waldron does not have any independent recollection of why Brazell was terminated.  [Brazell 20:3-9].  It is Waldron's normal process to review a written statement provided by an employee as part of the review of the Form 5.  [Waldron 22:9-12].  Waldron has no recollection of reviewing Brazell's specifically or taking any action upon reading it.  [Waldron 25:4-27:15].  Waldron does not believe her recollections surrounding this matter will get better.  [Waldron 28:12-24].  There are no documents that will help her refresh her recollection.  [Waldron 29:3-9].

On November 12, 2019, Brazell got her driver's license back after a year, as expected. [Brazell 112:4-12; 124:15-21].

## MEMORANDUM OF LAW

### I.   <u>Summary Judgment Standard</u>

Summary judgment is proper if the record evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those items that the party believes demonstrates the absence of any genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party bears the burden of coming forward with evidence of each essential element of its defenses such that a reasonable jury could find in its favor. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 1080 (11th Cir. 1990).

An issue of fact is "material" if it could affect the outcome of the case. *Hickson Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir.2004)(citations omitted). The opposing party must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson Corp.,* 357 F.3d at 1260, *quoting Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co.,* 475 U.S. at 587 (internal quotation marks omitted).

**II.** **The County Engaged in Per Se Retaliation When It Conditioned Brazell's Continued Employment Upon Her Execution of Waiver and Release of Her Title VII and FCRA Claims.**

      *A.*    *Plaintiff's Refusal to Sign the Waiver and Release is a But-For Cause of Her Termination.*

In two recent cases, the United States Supreme Court recently clarified this in the Title VII context finding that "[i]n the language of law, this means that Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation. *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020)(citing *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360). "That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. *Id.* "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* In *Bostock*, the Supreme Court stated:

> Nor does it matter that, when an employer treats one employee worse because of that individual's sex, other factors may contribute to the decision. Consider an employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that rule because an employee is a woman *and* a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male employee. Likewise here. When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies). But Title VII doesn't care. If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach.

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1742 (2020).   Title VII's but-for causation "doesn't care" that "two causal factors may be in play."   If Defendant would not have discharged Brazell but for her protected activity, "the statute's causation standard is met, and liability may be attached."   *Id.*   And, as discussed below, the undisputed evidence shows that Plaintiff's protected activity – complaining about how her sexual harassment complaint was handled and refusing to waive her Title VII rights in exchange for continued employment

– was a causal factor in both decisions.  Had Plaintiff signed the Waiver and Release, her employment would not have been terminated.  Because she did not sign the Waiver and Release, her employment was terminated.  Thus, Plaintiff's refusal to waive her claims under Title VII and the FCRA is a "but for" cause of her termination.

> B.   *The Court Need Not Engage in the* McDonnell Douglas *Burden-Shifting Analysis Because There Is Direct Evidence of Retaliation.*

There are two different analyses typically used in employment discrimination cases.  In cases where there is indirect evidence of discrimination, courts frequently utilize the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  However, when there is direct evidence of discrimination, courts utilize a much simpler analysis.  *See Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128 (3rd Cir. 1996)(district court erred in using *McDonnell Douglas* analysis in *per se* intentional discrimination disparate treatment case); *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697, 704 n. 18 (8th Cir. 1987)(*per se* discrimination eliminates the *McDonnell Douglas* burden-shifting procedure).  The same direct evidence analysis applies to retaliation cases.  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1191 (11th Cir. 1997)("Because we hold that Merritt has presented sufficient direct evidence to survive summary judgment, we do not address his *McDonnell Douglas* argument and whether he has presented evidence of pretext.").  The FCRA is modeled after Title VII and claims brought under it are analyzed under the same framework.  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

To make out a *prima facie* case of retaliation a plaintiff generally must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

Where there is direct evidence of a facially discriminatory decision, plaintiff bears no further burden. *Ferrill v. The Parker Group, Inc.*, 168 F. 3d 468, 472 (11th Cir. 1999)(affirming summary judgment for employee where job assignments were made based upon race).  Direct evidence "provides a simple and quick route to proving a claim for discrimination."  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).  Once a plaintiff establishes by direct evidence that an employer acted with a discriminatory intent, "the employer may escape liability only by showing that the same decision would have been reached absent the illegal motive." *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1498 n. 4 (11th Cir.1985); *see also Ferrill*, 168 F. 3d at 472 (employer "must rebut the direct evidence of discrimination by affirmatively proving that it would have made the same decision even if it had not taken race into account"); *Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 857–76 (11th Cir.1985); *Dysart v. Palms of Pasadena Hosp., LP*, 89 F. Supp. 3d 1311, 1316 (M.D. Fla. 2015).

As shown below, because there is direct evidence, the Court need not engage in any burden shifting and can find, as a matter of law, that the County retaliated against Plaintiff when it terminated her because she would not waive her claims under Title VII and the FCRA.

C.    *An Employee Can Establish a Causal Connection between Her Protected Activity and Termination Where Her Employer Responds to Her Protected Activity by Conditioning the Employee's Continued Employment on a Release of Claims, then Fires the Employee for Rejecting the Release.*

In this case, there is undisputed direct evidence of a facially retaliatory decision. Plaintiff engaged in statutorily protected behavior when she complained of sexual harassment, complained about how the County addressed her sexual harassment, complained that she was treated differently than other employees who had business purposes only licenses, and, finally, when she refused to sign the Waiver and Release waiving her claims under Title VII and the

17

FCRA.  She suffered a materially adverse action when she was terminated.  Thus, the causal relation between these two events is the only element left to prove, and there is undisputed evidence that they were directly related.  The County admits that Brazell's termination was a result of her failure to sign the Waiver and Release, which included a release of her Title VII and FCRA claims.  As shown above, it is undisputed that if Brazell had signed the Waver and Release, she would not have been terminated.  Thus, the County's insistence that Brazell waive away her Title VII rights – and her refusal to do so – is a but-for cause of her termination.  The Waiver and Release was the condition for her to maintain her employment.  The case law is clear that conditioning continued employment upon such a waiver is *per se* retaliatory.

Recently, the Eleventh Circuit held that its case law "confirms that a plaintiff could establish a causal connection between the protected activity and termination when an employer responds to an employee's discrimination complaint by conditioning the employee's continued employment on a release of claims and then fires the employee for rejecting the release." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1246 (11th Cir. 2020).  In *Knox*, the plaintiff had been suspended for violating a workplace violence policy.  *Id*. at 1240.  While he was suspended, he complained that he was being treated differently based on his race.  *Id*. at 1240.  His employer offered to have him come back to work if he took an anger management program and signed a waiver and release of this Title VII claims.  *Id*. at 1240.  When he refused to sign the release, he was terminated.  *Id*. at 1240.  The Eleventh Circuit reversed summary judgment, concluding that "[i]t is clear from our case law that an employer may not respond to a claim of race discrimination by conditioning continued employment on a release of claims and firing the employee for refusing. To do so constitutes unlawful retaliation.  *Id*.

Here, we have a case with eerily similar facts.  Brazell was subject to termination for allegedly failing to meet one of the requirements of her job – holding a valid driver's license. The County was also aware of Brazell's prior complaint of sexual harassment and ongoing concerns about how it was handled.  Like in *Knox*, the County offered to allow Brazell the ability to maintain her job, provided she sign a Waiver and Release, which would foreclose her ability to pursue her Title VII claims of sexual harassment and retaliation.  When Plaintiff refused, the County began pre-disciplinary procedures.  During her pre-disciplinary hearing, Brazell submitted a written statement where she again expressed concerns that she believed she was being treated differently than others and retaliated against due to her prior claims of sexual harassment and her criticism of how Human Resources handled it.  The County responded, not by investigating her concerns, but by presenting her with a revised Waiver and Release, which still contained a release of her Title VII and FCRA claims.  As in *Knox*, when Brazell refused to waive her claims, the County terminated her.  Thus, subsequent to claims of sexual harassment and retaliation, the County conditioned her continued employment upon a release of these claims and fired her for refusing.  According to *Knox,* this is unlawful retaliation.

For these reasons, this Court can find, as a matter of law, that there is direct evidence of retaliation prohibited by Title VII and the FCRA.

> D.     *While a Burden-Shifting Analysis is Not Appropriate, Should the Court Utilize It, the Result – a Finding of Unlawful Retaliation – Is the Same.*

Should the Court determine that a burden-shifting analysis is to be used, the County will argue that the legitimate, non-discriminatory reason for termination was her failure to possess a valid driver's license.  However, the evidence is clear that Brazell did not need to possess this valid driver's license to maintain her employment.  She had been performing her

job successfully for ten months with a business use only license.  Moreover, the County was willing to allow her to continue to do so until she could get her regular license back in November, provided she signed the Waiver and Release. When Brazell did not sign it, and only then, the County proceeded with the termination.  Thus, it could not have been the lack of a regular license that was the County's true concern.  Further, the County had a policy which would have allowed her to drive while at work on written approval of the County Administrator.  When Brazell sought this approval from her supervisors and HR, no one took any steps to obtain this approval.  Thus, the evidence shows that it was not the fact that she had a business purposes only license that led to her termination.  Instead, it was Brazell's refusal to sign the Waiver and Release and waive her Title VII and FCRA claims that was the "but for" cause of her termination.

Thus, even if the Court applies the McDonnell Douglas framework, it can find, as a matter of law, that the County engaged in unlawful retaliation and that any articulated reason for this termination was merely pretext for the true reason – Brazell's refusal to waive her claims under Title VII and the FCRA.

**III.   The County's Affirmative Defenses Do Not Prohibit Summary Judgment as to Liability on the Retaliation Claim.**

The County's First Affirmative Defense is that Plaintiff failed to allege that 'but for' retaliation she would not have been dismissed and, as such, Plaintiff has failed to allege a cause of action for retaliatory discharge.  This is not a true affirmative defense, but an argument that Plaintiff cannot make out a *prima facie* case.  As addressed above, Plaintiff can and has established retaliatory discharge by showing that her refusal to waive her Title VII and FCRA claims are a clear "but for" cause of her termination.

The County's Second Affirmative Defense is that Plaintiff failed to mitigate her damages.  This is an issue for the damages, for which Plaintiff does not seek summary judgment.

The County's Third Affirmative Defense is that Plaintiff cannot establish a causal nexus between her alleged protected activity.  Again, this is not a true affirmative defense but goes to Plaintiff's *prima facie* case.  As shown above, Plaintiff continued to engage in protected activity even during her pre-disciplinary hearing shortly before her termination and Plaintiff's refusal to waive her Title VII rights is protected activity.  Under *Knox,* Plaintiff's refusal to release such claims and termination as a result establishes the causal connection required to prove a retaliation claim.

The County's Fourth Affirmative Defense is that Plaintiff failed to exhaust her administrative remedies because her termination was not raised in her EEOC charge.  Plaintiff's lengthy charge of discrimination is filed as Exhibit 5 and there can be no argument that Plaintiff's complaint or this motion goes beyond the scope of those claims, which specifically states that she was terminated on September 20, 2019 as a result of failing to sign the Waiver and Release.

The County's Fifth Affirmative Defense is that Plaintiff failed to file her lawsuit within 90 days of receipt of her right to sue from the EEOC.  This is simply untrue.  The right to sue is filed as Exhibit 6 and indicates it was mailed on December 6, 2019 and the lawsuit was filed on March 2, 2020, 87 days later.

The County's Sixth Affirmative Defense is that acts that occurred more than 365 days before Plaintiff filed her charge of discrimination are time barred.  This argument applies solely to Plaintiff's discrimination claim, which is not the subject of this motion.

The County's Seventh Affirmative Defense is that there is a legitimate, nondiscriminatory, nonretaliatory reason for Plaintiff's termination. This is not a true affirmative defense, but part of the *McDonnell-Douglas* burden-shifting analysis. As addressed above, there is direct evidence in this case and no burden-shifting is done. Even if *McDonnell-Douglas* did apply, as shown above, the undisputed evidence contradicts any legitimate, nondiscriminatory reason.

The County's Eighth Affirmative Defense is that Plaintiff failed to state a claim upon which relief can be granted under any theory. As shown above, the undisputed evidence establishes that Plaintiff's termination following her refusal to sign the Waiver and Release was retaliatory.

The County's Ninth Affirmative Defense is that Defendant acted in good faith and exercised reasonable care to prevent and promptly correct any discriminatory, harassing, or retaliatory conduct. The evidence presented above establishing retaliation proves otherwise.

The County's Tenth Affirmative Defense is that the Defendant acted in good faith or with reasonable grounds for believing its actions did not violate laws. While Brazell disputes that she was discriminated against in good faith, it ultimately does not matter for the purposes of establishing liability because as previously noted

> the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988) *opinion amended on reh'g*, 848 F.2d 1522 (11th Cir. 1988)("mere

protestations of lack of discriminatory intent and affirmations of good faith do not suffice to rebut a prima facie case").

The County's Eleventh Affirmative Defense is that to the extent claims are duplicative, Plaintiff is not entitled to duplicative recovery.  Since this motion seeks judgment as to liability only, this need not be addressed.

The County's Twelfth Affirmative Defense is that this lawsuit is subject to the caps set forth in Chapter 760, Florida Statutes.  Since this motion seeks judgment as to liability only, this need not be addressed.

The County's Thirteenth Affirmative Defense is that §760.10(1) requires that Plaintiff establish proof that Defendant terminated her "because of" discrimination and not as "a motivating factor."  Plaintiff is not moving for summary judgment as to her discrimination claims.  As demonstrated above, Plaintiff has shown that her protected activity was a "but for" cause of her termination and is not relying on a "motivating factor" analysis in this motion.

The County's Fourteenth Affirmative Defense is that Plaintiff is not entitled to front pay damages or pre- or post-judgment interest pursuant to Chapter 760, Florida Statutes.  Since this motion seeks judgment as to liability only, this need not be addressed.

Therefore, these affirmative defenses do not prevent the entry of judgment for Brazell as requested in this motion.

## CONCLUSION

For the reasons outlined above, Plaintiff respectfully requests this Court enter summary judgment that the County engaged in unlawful retaliation under Title VII and the FCRA when it terminated Plaintiff for refusing to sign the Waiver and Release.

Respectfully submitted,

/s/ Michelle Erin Nadeau
**Ryan D. Barack**
Florida Bar No. 0148430
rbarack@employeerights.com
Jackie@employeerights.com
**Michelle Erin Nadeau**
Florida Bar No. 0060396
mnadeau@employeerights.com
Jackie@employeerights.com
**Kwall Barack Nadeau PLLC**
304 S. Belcher Rd., Suite C
Clearwater, Florida 33765
(727) 441-4947
(727) 447-3158 Fax
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via the Court's CM/ECF system on January 5, 2020 to all counsel of record.

/s/ Michelle Erin Nadeau
**Attorney**