UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CIVIL DIVISION

TIFFANI BRAZELL,

     **Plaintiff,**

v.                              **Case No: 8:20-cv-485-T-24AEP**

HILLSBOROUGH COUNTY BOARD
OF COUNTY COMMISSIONERS,

     **Defendant.**

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT**

Plaintiff Tiffani Brazell ("Plaintiff" or "Brazell"), by and through the undersigned counsel, hereby responds to Defendant Hillsborough County Board of County Commissioners' ("Defendant" or "the County") Motion for Summary Judgment.  For the reasons outlined below, Plaintiff respectfully requests that the Court deny Defendant's motion.

**STATEMENT OF UNDISPUTED AND DISPUTED FACTS**

**I.**     **Background Information**

Matthew Stewart was a Human Resources Manager Defendant. [Doc. 15-1 – Stewart 33:21-23].[1]  Erica Herrera was a Human Resources Partner with responsibility for the Parks and Recreation Department.  [Doc. 15-2 – Herrera 13: 15-22; 14:17-15:21].  Herrera reported to Stewart until his resignation.  [Herrera 24:1-6].  Beverly Waldron was the Director of Human Resources at Hillsborough County before retiring on October 31, 2019.  [Doc. 15-3 – Waldron 6:1-4; 9:3-4].

Plaintiff first began working for the Parks Department, supervising children, when she

---

[1]     Deposition testimony will be cited using the last name of the deponent, followed by the page and line number or exhibit number.  Depositions were previously filed with Doc 15.

graduated from high school in 2015, prior to leaving for college.  [Doc. 15-4 – Brazell 28:25-30:4].

She testified how much she loved this job because she had grown up in the Parks Department.

[Brazell 25:18-23].  After a year of college, Brazell returned to the Parks Department in a part time

position and ultimately secured a full time position.  [Brazell 34:15-35:11; 41:8-19].

During her employment, Brazell was never required to drive as part of her job and cannot

recall ever driving children during her employment.  [Brazell 65:15-18; 68:14-19; 91:9-11].

## II.      Plaintiff Was the Victim of Sexual Harassment by Her Supervisor.

At Jackson Springs, Brazell's supervisor was Wayne Mayweather.  [Brazell 45:16-46:3].

Mayweather repeatedly tried to get Brazell alone and away from the cameras, which made Brazell

uncomfortable.  [Brazell 48:2-15]. Mayweather told Brazell he needed her phone number as her

supervisor and then began calling her "pretty often." [Brazell 49:17-50:9].  When he would call just

to talk, Brazell would say she did not want to talk and they can talk at work.  [Brazell 50:10-17].

Although Brazell was clear, Mayweather continued.  [Brazell 50:15-19].  Mayweather made sexual,

vulgar comments to Brazell, culminating in one where he said "he was going to fuck [Brazell] with

his big black dick where there weren't cameras."  [Brazell 48:21-49:2].   He also told another

employee when Brazell dropped her keys that she "better not drop them keys in front of me," which

was construed to be of a sexual nature.  [Brazell 59:19-60:22].  Brazell reported these comments to

a supervisor, Adrienne Rouse, and HR.  [Brazell 51:11-18; 53:1-8].  Unbeknownst to Brazell at the

time, Mayweather was placed on a three-month leave before returning to work at a different location.

[Brazell 53:9-54:11].  Brazell still saw Mayweather at meetings on several occasions.  [Brazell 54:12-

19].  Brazell only found out about Mayweather's leave and reassignment after she asked for a follow-

up meeting.  [Brazell 55:21-56:2].   Brazell thought there was a zero-tolerance policy and was

disappointed in the result of the County's investigation.  [Brazell 56:3-14].

Brazell's complaints of sexual harassment were sustained.   [Stewart 44:19-22].   The County's investigation concluded that Brazell's harasser had violated County policy by sexually harassing her.  [Herrera 68:6-16].

### III.   Plaintiff Began Expressing Concerns Regarding the Handling of her Sexual Harassment Complaint.

In 2018, Brazell, Stewart, Herrera, and someone from the County Attorney's Office attended a meeting where Brazell stated she was unhappy about the outcome of the sexual harassment complaint, that she was upset that she had run into her harasser at a meeting, and that she was concerned no one told her that she would potentially be encountering him again.  [Stewart 42:13-23; Herrera 27:8-28:2; 28:3-17; 29:1-4].  Brazell was concerned that the County had not done enough in response to her sexual harassment complaint.  [Herrera 29:5-9].  No actions were taken as a result of Brazell raising these concerns at this meeting in 2018.  [Herrera 28:18-25].

### IV.   Brazell's License Was Suspended and She Was Given a Business Purposes License.

On November 11, 2018, Brazell was involved in an accident, refused a breathalyzer, and was arrested.  [Brazell 70:1-79:19].  Within a day or two of the incident, Brazell received her business purposes license.  [Brazell 81:14-18].  Brazell informed the County about the status of her license. [Brazell 82:9-14].  Brazell had a conversation about the accident with HR and, when asked, she told them that she did not drive as part of her job.  [Herrera 34:1-16]. Herrera understood that Brazell's regular license would remain suspended for a year following the accident.  [Herrera 35:24-36:5].

Brazell met with Herrera and Stewart who asked her about the license and when she would get her regular license back.  [Brazell 84:11-22].  They did not express any concerns over her possession of a business purposes license, which allowed her to drive herself to another location or a meeting while working.  [Brazell 84:23-85:2; 92:24-93:8].

**V.       The County Conditioned Brazell's Continued Employment on a Release of her Title VII and FCRA Claims**

Herrera and Stewart came up with the idea of having Brazell sign a Waiver and Release that "would allow her to keep her job through November…in exchange for executing the Waiver and Release." [Herrera 42:12-43:16; 45:2-4].  The Agreement contained a waiver and release of claims Brazell could bring against the County, including under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act.  [Herrera 46:11-47:3].  Herrera and Stewart were aware of Brazell's past sexual harassment complaint and understood that signing this document would release her ability to bring claims against the County, including those associated with her sexual harassment and related concerns.  [Herrera 73:19-74:19; Stewart 61:19-62:1; Stewart 88:13-25].[2]

Brazell's employment was contingent on signing this Waiver and Release, meaning she could sign it or she would be terminated: "If she wasn't going to sign the Waiver and she couldn't guarantee us a date, the only other option available to the County was dismissal." [Stewart 98:13-15].  In fact, as noted below, this is what occurred: "Because she didn't enter into the Waiver and Release we rendered the decision from the hearing, which was separation." [Stewart 103:11-14].

If Brazell had signed the Waiver and had her license reinstated by the date expected (which she did), her employment would not have been terminated. [Stewart 103:17-22; 104:24-105:10].

When Brazell was presented with the Waiver and Release in August 2019, she declined to sign it. [Herrera 48:22-25].  In her email declining to sign this Waiver and Release, Brazell stated

---

[2]       The County has a pattern and practice of asking employees to waive claims after they've complained of discrimination.  Subsequent to Brazell's termination, Stewart himself "raised multiple concerns regarding some possible discrimination within the Human Resources Department." [Stewart 18:1-8].  Stewart was reassigned and presented with a Waiver and Release in retaliation for raising these concerns.  [Stewart 18:18-22; 18:14-22].  The County was explicit that Stewart would need to sign a Waiver and Release or he would be terminated. [Stewart 22:17-23:2; 28:14-18].

4

that she does meet the minimum qualifications (explaining that her business purposes license is still a "valid Florida Driver's License" with restrictions), explained that she does not drive as part of her job, and, to the extent she needs to drive for her job, and asked for written permission from the County Administrator to drive pursuant to County policy, which would have allowed her to meet the minimum qualifications HR was articulating. [Herrera Ex. 1].

Male employees with business purposes licenses were not terminated or asked to sign a Waiver and Release like Brazell was. [Attached Ex. 1 – Brazell Declaration ¶3-6].

**VI.**     **Brazell's Requests for the County Administrator to Approve Her Use of Her Business Purposes License Were Ignored.**

County policy states that "[a]n employee whose driving privileges are suspended for DUI under FS322.2615 may not drive on County business. An employee, upon being issued a license for "business or employment purposes only "…may not drive without the written permission of the County Administrator. [Herrera Ex. 2 ¶3-6].

Brazell explicitly asked both of her supervisors and HR for the written permission contemplated by this policy. [Stewart 56:16-19; Herrera Ex. 1]. Despite this request, no one did anything to seek this permission from the County Administrator. [Stewart 55:8-56:15; Herrera 54:10-12]. Instead, Herrera testified that they "had a number of conversations around whether or not an employee should be permitted to drive with a business purpose only" license and they "concluded that there was just too much risk to the County to allow an employee to drive under such circumstances." [Herrera 53:1-9]. Herrera is unaware of any County policy that provides her with the discretion to make decisions on behalf of the County Administrator. [Herrera 58:10-14]. Brazell's request for this written permission – the only way she could comply with what they were asking of her other than signing the Waiver and Release – was completely ignored. [Herrera 59:1-21]. Waldron was unaware that Brazell even made this request. [Waldron 23:-7-10; 24:21-24]. In

fact, no one in HR seems to understand how this permission is even sought or did anything to find out what that process is.  [Herrera 49:4-50:13; 61:13-19; Herrera 62:11-18; Waldron 24:17-20].

Meanwhile, Brazell was not informed that no one would be seeking the written permission she had requested or that her request was deficient.  [Herrera 60:17-21; 62:20-22].

**VII.   For Ten Months, Brazell Successfully Performed Her Job with Her Restricted License.**

Brazell repeatedly told the County that it was her intention to get her license restored as soon as she could, and she had told the County this from the beginning.  [Herrera 65:23-66:7].  The County knew her standard driver's license would be reinstated on November 11, 2019.  [Stewart 59:9-19].

For the ten months prior to her termination, Brazell had continued to do her job successfully while holding the business purposes license with no impact on County operations.  [Herrera 37:8-38:2; 66:8-16; Stewart 76:10-14; 84:23-25].

**VIII.  At Her Pre-Disciplinary Hearing, Prior to Her Termination, Brazell Continued to Express Concerns Regarding Retaliation.**

Subsequent to her first refusal to sign the Waiver and the Release, the County had proceeded with the pre-disciplinary process and held a pre-disciplinary hearing on September 9, 2019.  [Herrera 64:9-15; Stewart 85:1-4].  Brazell again raised concerns she had made previously that male employees who had had DUIs were not subjected to these same requirements.  [Stewart 73:16-74:5; Brazell 107:24-108:22].  At the pre-disciplinary hearing, Brazell presented a written statement which stated that she felt that she was the victim of retaliation.  [Herrera 77:5-17].

In addition to outlining her love for her job in the Parks Department she had grown up in and expressing regret for the decisions that led to her accident and arrest, Brazell's statement expressed frustration that she had done everything that had been asked of her and was still being subjected to discipline and Brazell raised concerns that she was being bullied and targeted by Human Resources and that she believes this may be retaliation for her continued persistence and questioning of how

6

HR handled her sexual harassment complaint.  [Stewart 66:10-21; Ex. 3].  Specifically, she stated:

> I would also like to mention that I feel that I am being bullied and targeted by Human Resources on this matter.  I am aware that others within the Parks and Recreation department have been faced with situations where their license was suspended for a period of time for similar circumstances – and were never rigorously sought after or had to face any consequences in respect to their employment.  Is it common practice for HR to pick and choose who they decide to discipline?
>
> My interactions with HR started when I approached HR with a sexual harassment complaint.  HR took an entire year to investigate and process this compliant [sic] and admittedly acknowledged that HR did not manage the complaint properly, timely, or in accordance with County policies.  The outcome of the other individual ended in suspension WITH PAY for two months, and having this individual transferred to another county department.  Matt Stewart of HR was the individual handling this case.  I have truly felt bullied and targeted through this situation regarding my license, possibly as a sort of retaliation for my continued persistence and questioning of how HR handled my sexual harassment complaint?

[Herrera Ex. 3, p. 3-4].

No investigation into these claims of retaliation was conducted, despite County policy requiring such investigations [Stewart 67:22-67:8; Herrera 78:1-5; 82:16-83:8].  Stewart testified that Brazell's claims should have triggered "at least a review of the claim to see what type of investigation was required," but this did not happen. [Stewart 68:11-23].

IX.     **Rather than Investigate Her Concerns, The County Terminated Brazell Less Than Two Months Before Her License Was Due to be Reinstated Because She Would Not Waive Her Claims Under Title VII and the FCRA.**

After the pre-disciplinary hearing – where Brazell again expressed her concerns that she was being retaliated against due to her sexual harassment complaint – the County gave Brazell another Waiver and Release.  [Herrera 64:16-18].  The County altered the agreement to address a concern about the timing of Brazell's license reinstatement.  [Herrera 64:19-65:12].  The provisions requiring her to waive her ability to bring claims under Title VII and the FCRA remained.  [Herrera 65:13-22].

The County was willing to allow Brazell to work without the valid license for a full year until she got her license back in November, but she had to sign the Waiver and Release in order to keep

her job.  [Herrera 13-22; Stewart 76:15-77:3; 87:23-88:2].  To keep her job, Brazell tried to sign the Waiver and Release while also stating that she was under duress or under pressure and the County Attorney's office refused and instead issued the determination of discipline.  [Stewart 69:13-70:9; 72:11-16].

When Brazell did not sign the Waiver and Release, she was terminated on September 20, 2019.  [Stewart 69:7-10; Stewart Ex. 4].  Brazell testified that HR informed her that her refusal to sign the Waiver and Release led to her termination.  [Brazell 105:11-22; 125:6-14].[3]  Waldron – the decision maker – was told that Brazell was offered a Waiver and Release and had chosen not to sign it.  [Herrera 88:15-18].[4]  If Brazell had signed the Waiver and Release, she would have kept her job [Herrera 106:18-107:3; Stewart 72:19-73:3].

On November 12, 2019, Brazell got her driver's license back after a year, as expected. [Brazell 112:4-12; 124:15-21].  Despite having her regular license, any post-termination offers of reinstatement made by the County were not unconditional and required Brazell to waive her Title VII and FCRA claims and any back pay claim.  [Herrera 107:4-108:2].

## MEMORANDUM OF LAW

I.    **A Reasonable Jury Could Find that Plaintiff Was Subjected to Unlawful Sex Discrimination.**

   A.    *Plaintiff Has Articulated a Prima Facie Case of Hostile Work Environment Due to Sexual Harassment.*

---

[3]    At this point, Brazell understood that even if she had magically gotten her license back on that day (which was legally impossible), she would still need to sign the Waiver and Release to keep her job.  [Brazell 106:13-20].

[4]    Waldron has no specific recollection of conversations leading up to Brazell's termination.  [Waldron 18:16-23; 28:5-11]. Waldron does not have any independent recollection of why Brazell was terminated.  [Brazell 20:3-9].  It is Waldron's normal process to review a written statement provided by an employee as part of the review of the Form 5.  [Waldron 22:9-12].  Waldron has no recollection of reviewing Brazell's specifically or taking any action upon reading it.  [Waldron 25:4-27:15].  Waldron does not believe her recollections surrounding this matter will get better.  [Waldron 28:12-24].  There are no documents that will help her refresh her recollection. [Waldron 29:3-9].

To prove sexual harassment under Title VII, where there was no tangible employment action taken as a result of the sexual harassment, a plaintiff must show

> (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).[5]

The County does not dispute that Plaintiff, as a female, was a member of a protected class. It is also undisputed that Plaintiff was subjected to unwelcome sexual harassment, as the County sustained her sexual harassment complaint, finding that her supervisor had sexually harassed her. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex").

In considering whether harassment is objectively severe or pervasive, courts look to "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Hulsey*, 367 F.3d at 1247-1248. Courts use a "totality of the circumstances approach, instead of requiring proof of each factor individually." *Id.* "In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1242 (11th Cir. 1999); *see also*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010)("workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context"). "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII. *Id.* at 808.

---

[5]    The FCRA is modeled after Title VII and claims brought under it are analyzed under the same framework. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

Plaintiff can establish that the sexual harassment by her supervisor was both objectively and subjectively severe or pervasive (and Defendant makes no argument otherwise). Plaintiff began working for Defendant as a teenager and was only two years out of high school when she was sexually harassed by her supervisor. He called her frequently to talk and continued to do so after Plaintiff asked him to stop. He regularly tried to get Brazell alone where there were no cameras. He discussed Brazell in a sexual manner with other employees. He made sexual, vulgar comments to Plaintiff, including a threat that "he was going to fuck [Brazell] with his big black dick where there weren't cameras." A reasonable jury could find that this sexual harassment was objectively frequent, severe, physically threatening and humiliating, and interfered with Plaintiff's ability to do her job.

The sexual harassment was clearly subjectively severe or pervasive as Plaintiff felt the need to complain to her supervisor and HR. Additionally, the County sustained Plaintiff's sexual harassment complaint, demonstrating that it also reasonably believed the behavior was problematic.

Defendant's motion seeks to dismiss the undisputed discrimination that occurred – the sexual harassment by her supervisor that led to Plaintiff's sexual harassment complaint in 2017 – however, this Court and the jury can consider the harassment Plaintiff faced during the entirety of her employment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105 (2002)("consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."). Plaintiff testified that she continued to see her sexual harasser at work and complained that the County had not sufficiently addressed her complaint, which undermines any argument that the County took prompt remedial action. She testified that following this complaint, HR continued to harass her and treat her differently than other employers because of this complaint. All of this

10

stemmed from her original sexual harassment complaint and the Court and the jury should look at the entirety of the facts, from the sexual harassment through her termination.

        B.        *Plaintiff Can Also Establish a Prima Facie Case of Sex Discrimination Due to Her Termination*

In addition to the sexual harassment analysis, the facts also support a sex discrimination claim based on the tangible adverse action of Plaintiff's termination. As Plaintiff has long complained, following the restriction of her license to business purposes, she was treated differently than male employees who had had their licenses similarly restricted.

In cases involving circumstantial evidence of discrimination, courts often apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792(1973). Under *McDonnell-Douglas*, an employee must initially show that (1) she was a member of a protected class, (2) she was qualified to do the job, (3) she was subjected to an adverse employment action, and (4) similarly situated employees outside of the protected class were treated differently. *Id.* The employer must then identify a legitimate, nondiscriminatory reason for its decision. *Id*. Once an employer meets that burden, it shifts back to the plaintiff to demonstrate that the proffered reason is not the true reason. *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).

Defendant concedes that Plaintiff is a member of a protected class and that she suffered an adverse employment action. Defendant focuses its argument on whether Plaintiff was qualified for her job, whether there were adequate comparators, and whether Plaintiff can establish pretext.

        (i)        <u>A Jury Can Find Plaintiff Was Qualified for the Position She Held.</u>

Defendant states that Plaintiff is not qualified for her job because she did not possess an unrestricted driver's license. However, the issue is far more complicated and a reasonable jury could find that an unrestricted license was not a true requirement of her job as Plaintiff performed her job for 10 months with a business purposes license.

Moreover, employees who have been discharged from a previously held position do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification. *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999)("Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position."); *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 (11th Cir. 1987)(same); *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1386 (11th Cir. 1983)(same).

Notwithstanding the fact that Plaintiff's qualification for the job she previously held can be inferred, whether she actually required an unrestricted license for her job is disputed. Plaintiff testified that she did not drive County vehicles nor did she drive children as part of her duties. Her driving was limited to attending meetings in her personal vehicle, something she could still do. Further, the County had a policy that allowed business purposes license with approval by the County Administrator. Although Plaintiff's request seeking this permission was ignored by her supervisors and HR, this policy shows that the County can and does permit business purposes licenses to be used. In fact, the testimony from all witnesses are the Plaintiff successfully performed her job for ten months with her business purposes license, demonstrating that she is qualified for the job.

Further, as outlined below the fact remains that other employees were permitted to work without a business purposes license, so the very discrimination that Plaintiff is complaining about is premised on the differential treatment of those without this qualification, undermining the County's position that this license was a true requirement to be qualified for the job.

(ii)     Plaintiff Was Treated Less Favorable Than Male Employees.

Plaintiff has identified male employees who have had business purposes licenses and were not terminated by the County. There is also no evidence that these individuals were required to sign a similar Waiver and Release to keep their job. All three individuals are men and outside Plaintiff's

12

protected class. In addition, none of these individuals complained of sexual harassment. While these individuals were permitted to work with their business purposes license, the County conditioned Plaintiff's employment on her signing a Waiver and Release and ultimately terminated her when she did not execute it. Thus, Plaintiff has identified similarly situated employees outside her protected class who were treated more favorably than she was.

Moreover, a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The Eleventh Circuit has held that "the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d. at 1328 (internal quotations omitted)*; see also Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1154 (11th Cir. 2005)("The fourth component, the one requiring outside-the-class comparators, is not an element of the claim itself.").

    (iii)    <u>The Disputed Facts Support a Finding that the County's Proffered Reason for Termination Was Pretextual.</u>

Should the Court determine that a burden-shifting analysis is to be used, summary judgment for the employer remains inappropriate. The County has argued that the legitimate, non-discriminatory reason for termination was her failure to possess an unrestricted driver's license. However, as demonstrated above, there is evidence that Brazell did not need to possess this unrestricted driver's license to maintain her employment which calls into question whether this is the true reason. Plaintiff had been performing her job successfully for ten months with a business use license. Moreover, the County was willing to allow her to continue to do so until she could get her

unrestricted license back in November, provided she signed the Waiver and Release. When Brazell did not agree to release her discrimination claims, and only then, the County proceeded with the termination.  Thus, a reasonable jury can find that it was not the lack of unrestricted license that was the County's true concern.

Further, the County had a policy which would have allowed her to drive while at work on written approval of the County Administrator.   When Brazell sought this approval from her supervisors and HR, no one took any steps to obtain this approval, which undermines the County's position that the license status was the true reason for her termination as this would also have solved the "problem" articulated by the County.  Additionally, as shown above, there is evidence of at least three male individuals who were not terminated for holding a business purposes license.  Thus, a reasonable jury could find that the County engaged in unlawful discrimination when it terminated Plaintiff for holding a business purposes license when it did not terminate male employees.

## II.       Evidence Shows That Plaintiff Was Subjected to Unlawful Retaliation.

As outlined in Plaintiff's own motion for partial summary judgment, this is a direct evidence case of retaliation, and the County's reliance on the *McDonnell Douglas* burden-shifting test is misplaced.  When there is direct evidence of discrimination, as there is in this case, courts utilize a much simpler analysis.  *See Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128 (3rd Cir. 1996)(district court erred in using *McDonnell Douglas* analysis in *per se* intentional discrimination disparate treatment case); *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697, 704 n. 18 (8th Cir. 1987)(*per se* discrimination eliminates the *McDonnell Douglas* burden-shifting procedure); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1191 (11th Cir. 1997)("Because we hold that Merritt has presented sufficient direct evidence to survive summary judgment, we do not address his *McDonnell Douglas* argument and whether he has presented evidence of pretext.").

14

To make out a *prima facie* case of retaliation a plaintiff generally must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  Where there is direct evidence of a facially discriminatory decision, plaintiff bears no further burden.  *Ferrill v. The Parker Group, Inc.*, 168 F. 3d 468, 472 (11th Cir. 1999)(affirming summary judgment for employee where job assignments were made based upon race).  Direct evidence "provides a simple and quick route to proving a claim for discrimination." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

    A.      *Plaintiff Engaged in Several Protected Activities.*

Defendant argues that only two events could have been protected activity for purposes of her retaliation claim: her September 2017 sexual harassment complaint and her post-termination EEOC charge.  This assumption ignores the many other times Plaintiff engaged in protected activity.

> The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The one is known as the "opposition clause," the other as the "participation clause,"

*Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 274 (2009).  The opposition clause extends to those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dept. of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989).

Pursuant to the opposition clause, Plaintiff engaged in statutorily protected behavior when she complained of sexual harassment, when she repeatedly complained about how the County addressed her sexual harassment, when she complained that she was being treated differently than

15

other employees who had business purposes licenses, and, finally, when she refused to sign the Waiver and Release waiving her claims under Title VII and the FCRA.

Additionally, it is unnecessary for Plaintiff to prove her underlying discrimination claim in order to succeed on his claim of retaliation "so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994)(internal quotations omitted).  The evidence shows that, at the time she made each complaint, Plaintiff reasonably believed (and the County agreed) that she was the victim of sexual harassment, that the County had not handled her sexual harassment complaint appropriately, and that male employees had not been asked to waive all rights when they had a business purposes license.  Her refusal to sign the Waiver and Release is not in dispute.

Thus, there is evidence of Plaintiff's ongoing complaints about how her original sexual harassment complaint was handled, her complaint that she was being treated differently than male employees with business purposes licenses, and her refusal to sign the Waiver and Release are statutorily protected activity.  Accordingly, summary judgment is inappropriate.

### B.     Plaintiff Can Establish a Causal Connection between Her Protected Activity and Her Termination.

Defendant also argues that there is no causal connection between Plaintiff's protected activity and her adverse employment action.  Defendant limits its arguments to the two protected acts it previously identified – the sexual harassment complaint and the filing of the EEOC charge.  However, when looking at the entire picture and all of Plaintiff's protected activity, the causal connection becomes clear and Plaintiff's protected activity is a "but for" reason for her termination.

The Supreme Court recently clarified that "but for" causation under Title VII "is established whenever a particular outcome would not have happened 'but for' the purported cause. *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020)."  "In other words, a but-for test directs us

16

to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id*. Further, Title VII's but-for causation "doesn't care" that "two causal factors may be in play." *Id.* at 1742.

If Defendant would not have discharged Brazell but for her protected activity, "the statute's causation standard is met, and liability may be attached." *Id*. The evidence shows that the protected activity above was a causal factor in the decision to terminate her employment as her refusal to sign the Waiver & Release was a "but for" cause of her termination.

In fact, there is direct evidence of this facially retaliatory decision. The County admits that Brazell's termination was a result of her failure to sign the Waiver and Release, which included a release of her Title VII and FCRA claims. As shown above, it is undisputed that if Brazell had signed the Waiver and Release, she would not have been terminated. The Waiver and Release was the condition for her to maintain her employment. But for her refusal to sign this document, she would have remained employed by the County.

The case law is clear that conditioning continued employment upon such a waiver is *per se* retaliatory. Recently, the Eleventh Circuit held that its case law "confirms that a plaintiff could establish a causal connection between the protected activity and termination when an employer responds to an employee's discrimination complaint by conditioning the employee's continued employment on a release of claims and then fires the employee for rejecting the release." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1246 (11th Cir. 2020). In *Knox*, the plaintiff had been suspended for violating a workplace violence policy. *Id*. at 1240. While he was suspended, he complained that he was being treated differently based on his race. *Id*. at 1240. His employer offered to have him come back to work if he signed a waiver and release of his Title VII claims and, when he refused, he was terminated. *Id*. at 1240. The Eleventh Circuit reversed summary judgment, concluding that "[i]t

17

is clear from our case law that an employer may not respond to a claim of race discrimination by conditioning continued employment on a release of claims and firing the employee for refusing. To do so constitutes unlawful retaliation. *Id*.

Like in *Knox*, the County offered to allow Brazell the ability to maintain her job, provided she sign a Waiver and Release of existing discrimination and retaliation claims she had raised. When Plaintiff refused, the County began pre-disciplinary procedures. During her pre-disciplinary hearing, Brazell submitted a written statement where she again expressed concerns that she believed she was being treated differently than others and retaliated against due to her prior claims of sexual harassment and her criticism of how Human Resources handled it. The County responded, not by investigating her concerns, but by presenting her with a revised Waiver and Release, releasing her Title VII and FCRA claims. As in *Knox*, when Brazell refused to waive her claims, the County terminated her. Thus, subsequent to claims of sexual harassment and retaliation, the County conditioned her continued employment upon a release of these claims and fired her for refusing. According to *Knox*, this is unlawful retaliation.

For these reasons, Plaintiff has moved for summary judgment herself and this Court can find, as a matter of law, that there is direct evidence of retaliation prohibited by Title VII and the FCRA. At minimum, there is a disputed issue of fact on this issue which precludes summary judgment in favor of the County on Plaintiff's retaliation claims.

C.      *Defendant's Argument that Plaintiff's Protected Activity Was Too Remote Fails.*

Defendant's arguments as to remoteness are again based on its limited view of protected activity. When we look at the broader protected activity, any remoteness argument disappears. Plaintiff complained of sexual harassment in 2017. In 2018, she began questioning how the sexual harassment complaint was handled. In 2019, she continued to question how her complaint was

18

handled, stated that she feels she is being harassed by human resources about her business purposes license, complained that male employees have not been treated the same way, and was asked to waive all rights under Title VII and FCRA to maintain her job. She even complained during her pre-disciplinary hearing for her termination. She ultimately refused to execute this Waiver and Release and was terminated as a direct result of this refusal. While the County wants to look at discrete acts and direct the Court solely to her sexual harassment complaint two years prior to her termination, the full picture shows that from 2017 through her termination, Plaintiff was engaged in protected activity and that her termination occurred immediately following the protected activity of her pre-disciplinary complaints of discrimination and retaliation and her refusal to sign the requested Waiver and Release.

D.     *Defendant's Reliance on a Superseding Cause Is Misplaced.*

Once again, expanding Defendant's limited view of protected activity undermines its argument regarding a superseding cause. Defendant argues that because Plaintiff had her license restricted following her complaint of sexual harassment, her termination cannot be because of the sexual harassment complaint. This ignores all of the protected activity Plaintiff continued to engage in both before and after her license was restricted. It also glosses over the fact that Plaintiff remained successfully employed for ten months with a restricted license and the County was willing to continue to employ her with that restricted license until she got her full license back less than two months later. However, the County required her to waive her Title VII and FCRA rights if she wished to maintain her employment. It also conditioned reinstatement upon this same Waiver and Release. A reasonable jury could find that it was not her license status that led to her termination but her continued complaints about harassment, discrimination, and retaliation and her refusal to waive her Title VII and FCRA rights, which would be a retaliatory discharge.

E.     *As Shown Above, A Reasonable Jury Can Find Pretext.*

19

Should the Court determine that a burden-shifting analysis is to be used, summary judgment for the employer remains inappropriate.  The County argues the legitimate, non-discriminatory reason for termination was her failure to possess an unrestricted driver's license.  However, as demonstrated above, the evidence is disputed as to whether Brazell needed to possess this unrestricted driver's license to maintain her employment.  She had been performing her job successfully for ten months with a business use only license, and the County was willing to allow her to continue to do so until she could get her regular license back in November, provided she signed the Waiver and Release. When Brazell did not sign it, and only then, the County proceeded with the termination.  Thus, Brazell's refusal to sign the Waiver and Release and waive her Title VII and FCRA claims was a "but for" cause of her termination.

## CONCLUSION

For the reasons outlined above, Plaintiff respectfully requests this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ Michelle Erin Nadeau
**Ryan D. Barack** Florida Bar No. 0148430
rbarack@employeerights.com
**Michelle Erin Nadeau** Florida Bar No. 0060396
mnadeau@employeerights.com
**Kwall Barack Nadeau PLLC**
304 S. Belcher Rd., Suite C
Clearwater, Florida 33765
(727) 441-4947/(727) 447-3158 Fax
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via the Court's CM/ECF system on January 19, 2021 to all counsel of record.

/s/ Michelle Erin Nadeau
**Attorney**

20