UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIFFANI BRAZELL,

        Plaintiff,

v.                                           Case No.  8:20-cv-485-SCB-AEP

HILLSBOROUGH COUNTY BOARD
OF COUNTY COMMISSIONERS,

        Defendant.

_____/

## ORDER

This cause comes before the Court on cross-motions for summary judgment (Doc. No. 15, 16), and the responses thereto (Doc. No. 19, 23).  The Court directed Defendant to file a reply brief.  (Doc. No. 28).  As explained below, summary judgment is granted in favor of Defendant on Plaintiff's gender discrimination and hostile work environment claims; both parties' motions for summary judgement are denied as to Plaintiff's retaliation claims.

## I.  Standard of Review[1]

_____

[1] In this case, Plaintiff has asserted claims of gender discrimination, sexual harassment, and retaliation.  Both parties move for summary judgment on Plaintiff's retaliation claims, and Defendant also seeks summary judgment on Plaintiff's gender discrimination and sexual harassment claims.  As such, the Court construes the evidence relating to Plaintiff's gender discrimination and sexual harassment claims in the light most favorable to Plaintiff, as the non-moving party.  With regard to the retaliation claims, both parties are moving for summary judgment, and the facts are viewed in the light most favorable to the non-moving party on each motion.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See id. (citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiff Tiffani Brazell worked as a Recreation Leader for Defendant Hillsborough County Board of County Commissioners.  In her position, she planned, coordinated, and supervised after school activities for children at Defendant's parks.

### The Sexual Harassment Complaint

When Plaintiff began working at the Jackson Springs park, her supervisor was Wayne Mayweather.  (Doc. No. 15-4, depo. p. 45).  Plaintiff contends that

2

Mayweather sexually harassed her.  Specifically, on one occasion, Plaintiff

contends that Mayweather called her and told her that "he was going to fuck [her]

with his big black dick where there weren't cameras."  (Doc. No. 15-4, depo. p. 48-

49).  Although Mayweather called and texted Plaintiff often, this was the only time

that he made a vulgar comment directly to her.  (Doc. No. 15-4, depo. p. 49-52).

The only other sexual comments that Plaintiff identifies that Mayweather made to

her were that he often texted her, "'Hey cutie.'"  (Doc. No. 15-4, depo. p. 52).

On another occasion, Plaintiff was alone with Mayweather in the park's

gym.  (Doc. No. 15-4, depo. p. 47-48).  Mayweather tried to get Plaintiff to come

into his office where there were no cameras, and this made Plaintiff feel

uncomfortable.  (Doc. No. 15-4, depo. p. 48).  Plaintiff contends that Mayweather

tried to talk with her by themselves multiple times.  (Doc. No. 15-4, depo. p. 48).

Plaintiff contends that on another occasion, Mayweather made a sexual

comment about her to someone else.  (Doc. No. 15-4, depo. p. 59-60).

Specifically, Plaintiff had dropped her keys and when she bent to pick them up,

Mayweather said to another employee "something like, 'She better not drop them

keys in front of me.'"  (Doc. No. 15-4, depo. p. 60).  This comment was not made

directly to Plaintiff, nor did she overhear it; she learned of it from the employee

that Mayweather said it to, and the comment made Plaintiff feel uncomfortable.

(Doc. No. 15-4, depo. p. 59-61).  Plaintiff reported these incidents to Defendant on

September 14, 2017.  (Doc. No. 15-4, depo. p. 52, 60; Doc. No. 15-1, depo. p. 38).

Defendant took about six months to investigate Plaintiff's sexual harassment

complaint.  (Doc. No. 15-1, depo. p. 39-40).  During this time, Plaintiff did not

report to Mayweather, and Plaintiff assumed that Defendant had fired him.

However, months later, Plaintiff saw Mayweather at a county meeting and realized

that Defendant had not fired him.  As a result, Plaintiff asked for a meeting with

HR.  (Doc. No. 15-4, depo. p. 56, 59)  It was during her August 2018 meeting with

Erica Herrera and Matthew Stewart from HR, as well as an attorney from the

county attorney's office, that Plaintiff first learned the results of Defendant's

investigation into her complaint and the manner in which Mayweather was

disciplined.  (Doc. No. 15-4, depo. p. 56; Doc. No. 15-2, depo. p. 27).  Defendant

had determined that Mayweather had violated Defendant's sexual harassment

policy, and as a result, Defendant had put Mayweather on a three-month leave,

transferred him to another part of the county, and demoted him.  (Doc. No. 15-4,

depo. p. 53-55; Doc. No. 15-2, depo. p. 68; Doc. No. 15-1, depo. p. 44).  Plaintiff

believes that Mayweather was still in a supervisory position after his demotion.

(Doc. No. 15-4, depo. p. 58-59).

Plaintiff was unhappy with the way that Defendant handled her complaint.

(Doc. No. 15-4, depo. p. 56).  Plaintiff believed that Defendant had a zero

tolerance policy towards sexual harassment, and as such, she assumed that

Defendant had terminated Mayweather.  (Doc. No. 15-4, depo. p. 56, 59).  Plaintiff

was also unhappy with the fact that she could still run into Mayweather at county

meetings.  (Doc. No. 15-2, dep. p. 28; Doc. No. 15-4, depo. p. 57).  Plaintiff

expressed her displeasure with the investigation and the resulting discipline during

this meeting, and she believes that Stewart and Herrera were not happy with her for

doing so.  (Doc. No. 15-4, depo. p. 115-20).

### Driver's License Issue

On November 11, 2018, Plaintiff was involved in a car accident after she

had been drinking.[2]  (Doc. No. 15-4, depo. p. 70).  Law enforcement asked

Plaintiff to take a breathalyzer test, but she refused.  (Doc. No. 15-4, depo. p. 75).

Plaintiff was charged with DUI and taken to jail for the night.  (Doc. No. 15-4,

depo. p. 74-75).  Ultimately, Plaintiff pled to a lesser charge of reckless driving,

and her license was suspended for a year due to her refusal to take the breathalyzer

test.  (Doc. No. 15-4, depo. p. 79, 112).

Within a day or two after the accident, Plaintiff went to the DMV to obtain a

business purpose only ("BPO") license.  (Doc. No. 15-4, depo. p. 81-82).  The

BPO license permitted Plaintiff to drive to and from work, school, religious

services, and for life necessities.  (Doc. No. 15-4, depo. p. 82).  Plaintiff

---

[2] Plaintiff was not on the job when the accident occurred.  (Doc. No. 15-4, depo. p. 70).

immediately told HR (Erica Herrera and Matthew Stewart) and her supervisor about the accident, her arrest, the suspension of her license for one year, and the BPO license.  (Doc. No. 15-4, depo. p. 77-78, 82, 84; Doc. No. 15-1, depo. p. 59).

When Plaintiff spoke with Herrera and Stewart about what had happened, they initially did not express any concerns to her or indicate that the BPO license would be a problem.  (Doc. No. 15-4, depo. p. 84-85).  On May 28, 2019, after Plaintiff's reckless driving case was resolved, Plaintiff emailed Herrera and Stewart a copy of the final judgment and sentence and reiterated that she still had a suspended license.  (Doc. No. 23-3).

Thereafter, Herrera and Stewart told Plaintiff that a BPO license was not sufficient for her job with Defendant, because the minimum qualifications for her position required that she have "a valid Driver License."  (Doc. No. 15-4, depo. p. 85-86; Doc. No. 16-2, p. 7 of 11).  Also, Defendant's "Motor Vehicle Safety" policy stated that employees with BPO licenses "may not drive without the written permission of the County Administrator."  (Doc. No. 16-3, p. 2).  That policy also provided that employees that do not possess a valid driver's license (which does not include a BPO license) "will be subject to Civil Service and Human Resources rules governing their continued employment up to and including termination." (Doc. No. 16-3, p. 1).

On June 5, 2019, Herrera asked the county attorney to draft a waiver and
release for Plaintiff to sign.  (Doc. No. 23-4).  On August 5, 2019, Herrera and
Stewart told Plaintiff that in order to avoid disciplinary action due to her only
having a BPO license, she would have to sign a waiver and release of all of her
claims to date (including all claims under Title VII and the Florida Civil Rights
Act), along with a resignation letter that would go into effect if she did not get her
regular license reinstated by a specific date.[3]  (Doc. No. 15-4, depo. p. 87-88, 96-
97; Doc. No. 26-2; Doc. No. 15-2, depo. p. 42-43, 48).  The waiver and release
included a provision that Plaintiff agreed to voluntarily resign from her position if
her driver's license was not reinstated by an agreed-upon date.  Defendant
contends that the waiver and release was necessary so that Defendant could have
some assurance of the date when Plaintiff would have her license reinstated.  (Doc.
No. 15-2, depo. p. 42; Doc. No. 15-1, depo. p. 61).  During this August 5, 2019
meeting, there was no discussion of Plaintiff's prior sexual harassment complaint.
(Doc. No. 15-4, depo. p. 89).

Plaintiff did not want to sign the waiver and release, nor did she want to
submit the contingent resignation letter.  (Doc. No. 16-1, p. 2-3).  She did not
understand why the BPO license was insufficient, given that the BPO license

---

[3] Herrera stated in her deposition that she and Stewart were the ones that came up with the option
of allowing Plaintiff to keep her job if she signed the waiver and release.  (Doc. No. 15-2, depo.
p. 42-43).

allowed her to drive for work purposes, she had continued to work for Defendant

as a Recreation Leader with her BPO license for almost nine months, and she

believed that she was not required to drive as part of her job.  (Doc. No. 15-4,

depo. p. 65, 90-92; Doc. No. 15-2, depo. p. 37-38).

Plaintiff admits, however, that she had been in vehicles driven by other

county employees that were transporting children to other parks.  (Doc. No. 15-4,

depo. p. 65-68).  She also admits that, prior to the accident, she had driven as part

of her job, but she contends that driving was not a *requirement*.  (Doc. No. 15-4,

depo. p. 90-92).  Defendant contends that Plaintiff was required to drive as part of

her job, and it was simply accommodating her while her license was suspended by

having other employees drive instead of Plaintiff.  (Doc. No. 15-2, depo. p. 39, 99).

On August 12, 2019, Plaintiff sent an email to Stewart and Herrera stating

that she would not be signing the waiver and release.  (Doc. No. 15-2, p. 51 of 61).

Plaintiff pointed out the exception to the rule that a BPO license is insufficient—

the Motor Vehicle Safety policy states that an employee with a BPO license can

drive on county business if they have "the written permission of the County

Administrator."  (Doc. No. 16-3, p. 2; Doc. No. 15-2, p. 52 of 61).  Plaintiff then

stated that she "respectfully request[ed] that written permission [be] granted per

this provision."  (Doc. No. 15-2, p. 52 of 61).  Stewart and Herrera did not act upon

Plaintiff's request.  (Doc. No. 15-4, depo. p. 119-20; Doc. No. 15-1, depo. p. 56-57; Doc. No. 15-2, depo. p. 50-53, 57-62).

After Plaintiff refused to sign the waiver and release and to submit the contingent resignation letter, Defendant decided to move forward with a pre-disciplinary hearing ("PDH") due to Plaintiff having only a BPO license.  (Doc. No. 15-2, depo. p. 63).  The PDH took place on September 9, 2019, and thereafter, Plaintiff was offered another opportunity to sign the waiver and release and to submit a contingent resignation letter.  (Doc. No. 15-2, depo. p. 64; Doc. No. 15-1, depo. p. 85).

On September 20, 2019, Plaintiff signed the waiver and release, along with a resignation letter that would become effective on November 20, 2019 if her license was not reinstated by that date, and she gave the documents to HR.  However, she stated that she was submitting the documents "[u]nder extreme duress," which led Defendant to reject the documents.  (Doc. No. 26-3; Doc. No. 26-4; Doc. No. 15-4, depo. p. 103-04).  Stewart and Herrera told Plaintiff that her failure to voluntarily sign the waiver and release and to submit the contingent resignation letter would result in discipline.  (Doc. No. 105-4, depo. p. 105-06, 125).

Plaintiff was terminated on September 20, 2019, with the stated reason for her termination being her failure to have an unrestricted license, which precluded

her from meeting the minimum qualifications for her position.[4]  (Doc. No. 15-3,

depo. p. 21).  However, had Plaintiff voluntarily signed the waiver and release and

submitted the contingent resignation letter, Plaintiff would not have been

terminated on September 20, 2019, and she would have been allowed to continue

working for Defendant with her BPO license until November 20, 2019 (and

thereafter if her license was reinstated).  (Doc. No. 15-2, depo. p. 106-07; Doc. No.

15-1, depo. p. 72-73, 103).

Plaintiff believes that retaliation was the true motivation for her termination,

and she stated her suspicion in her written statement that she submitted at the PDH.

(Doc. No. 15-1, depo. p. 65-66; Doc. No. 16-1).  In her written statement, Plaintiff

questioned why she was being disciplined for having a BPO license, since she was

not required to drive for her job, and regardless, a BPO license allowed her to drive

for work purposes.  (Doc. No. 16-1).  Additionally, Plaintiff alleged that she felt

that she was facing discipline over her BPO license as a means of retaliating

against her for complaining about the investigation into her sexual harassment

complaint, stating:

> I would also like to mention that I feel that I am being
> bullied and targeted by Human Resources on this matter. I
> am aware that others within the Parks and Recreations
> department have been faced with situations where their

---

[4] Beverly Waldron (the HR Director) was the final decisionmaker for the decision to terminate
Plaintiff's employment, but Stewart and Herrera recommended to Waldron that Plaintiff be
terminated.  (Doc. No. 15-1, depo. p. 91-94, 98-99; Doc. No. 15-2, depo. p. 75-76).  Herrera had
told Waldron of Plaintiff's refusal to sign the waiver and release.  (Doc. No. 15-2, p. 88).

> license was suspended for a period of time for similar
> circumstances - and were never rigorously sought after or
> had to face any consequences in respect to their
> employment. Is it common practice for HR to pick and
> choose who they decide to discipline?
>
> My interactions with HR started when I approached HR
> with a sexual harassment complaint. HR took an entire
> year to investigate and process this compliant [sic] and
> admittedly acknowledged that HR did not manage the
> complaint properly, timely, or in accordance with County
> policies. The outcome of the other individual ended in
> suspension WITH PAY for two months, and having this
> individual transferred to another county department. Matt
> Stewart of HR was the individual handling this case. I have
> truly felt bullied and targeted through this situation
> regarding my license, possibly as a sort of retaliation for
> my continued persistence and questioning of how HR
> handled the sexual harassment complaint?

(Doc. No. 16-1, p. 3-4).  Defendant did not investigate Plaintiff's complaint of

retaliation contained in her written statement that was submitted at the PDH.  (Doc.

No. 15-1, depo. p. 66-68; Doc. No. 15-2, depo. p. 77-78, 81-83).

During her deposition, Plaintiff elaborated on her retaliation theory, stating

that she believed that Herrera and Stewart were retaliating against her for her

complaints about the sexual harassment investigation and resulting discipline for

Mayweather, which they all discussed during their August 2018 meeting.  (Doc.

No. 15-4, depo. p. 114-20).  In support of this contention, Plaintiff points out that

she had asked HR to see if the County Administrator would consider approving her

continued employment with a BPO license, but HR did not act on Plaintiff's

multiple requests.  (Doc. No. 15-4, depo. p. 119-20; Doc. No. 15-1, depo. p. 56-57; Doc. No. 15-2, depo. p. 50-53, 57-62).  Additionally, Plaintiff points out that other Recreation Leaders that had restricted licenses were not required to sign a waiver and release of their claims in order to remain employed with Defendant.  (Doc. No. 15-4, depo. p. 117-19; Doc. No. 19-1).  Specifically, Plaintiff points to two male Recreation Leaders, Franklin Gates and Vince Bowers.[5]  (Doc. No. 19-1).

On December 29, 2005, Gates had his license suspended after he was driving while intoxicated, and he had a BPO license until his license was reinstated on March 24, 2006.  (Doc. No. 19-1, p. 2).  While Gates received a written reprimand for having a suspended license and driving while intoxicated, Plaintiff contends that he was not required to sign a waiver and release in order to keep his job.  (Doc. No. 19-1, p. 1-2; Doc. No. 15-2, depo. p. 106).

Likewise, on October 5, 2009, Bowers got a DUI, which presumably led to him having a restricted license.  (Doc. No. 19-1, p. 4).  Plaintiff contends that Bowers, like Gates, was not required to sign a waiver and release in order to keep his job.  (Doc. No. 19-1, p. 1; Doc. No. 15-2, depo. p. 106).

Plaintiff's license was reinstated on November 12, 2019—less than two months after her termination.  (Doc. No. 15-4, depo. p. 124).  On December 17,

---

[5] Plaintiff names a third male employee, David Docobo, but she provides no information regarding his job title or any information regarding the suspension of his license.  (Doc. No. 19-1).

2019, Defendant received a copy of the charge of discrimination that Plaintiff had filed with the EEOC, in which she alleged gender discrimination, sexual harassment, and retaliation. (Doc. No. 16-2, ¶ 6; Doc. No. 16-4). After Plaintiff's termination, Defendant contends that it held Plaintiff's position for her and made multiple offers to reinstate her, but reinstatement was contingent on Plaintiff signing the waiver and release of all of her claims. (Doc. No. 15-2, depo. p. 102-104, 107-08). In January of 2020, Plaintiff rejected Defendant's offers. (Doc. No. 15-2, depo. p. 104-05).

## Plaintiff's Claims

As a result of the above, Plaintiff filed suit against Defendant under Title VII and the Florida Civil Rights Act ("FCRA"). Specifically, she contends that Defendant discriminated against her by Mayweather's creation of a hostile work environment and by Defendant treating male employees with suspended licenses more favorably than she was treated. She also contends that Defendant retaliated against her for making the sexual harassment complaint and then complaining that Defendant undertook an inadequate investigation and failed to properly discipline Mayweather for his harassing conduct.

## III.  Motions for Summary Judgment

The parties have filed cross-motions for summary judgment on Plaintiff's retaliation claims. Additionally, Defendant moves for summary judgment on

Plaintiff's gender discrimination and sexual harassment claims.  Accordingly, the Court will analyze each claim.[6]

## A.  Hostile Work Environment

Plaintiff contends that Defendant discriminated against her by Mayweather's creation of a hostile work environment.  Defendant moves for summary judgment on Plaintiff's hostile work environment claims, arguing that Plaintiff cannot show that the harassment was sufficiently severe or pervasive.  The Court agrees with Defendant.

In order to prove her hostile work environment claims, Plaintiff must show the following: "(1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists."  Hulsey v. Pride Restaurants, LLC, 367 F. 3d 1238, 1244 (11th Cir. 2004)(citations omitted). Defendant argues that Plaintiff cannot establish the fourth element—that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

---

[6] Plaintiff's claims are asserted under both Title VII and the FCRA.  "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, . . . the state-law claims do not need separate discussion and their outcome is the same as the federal ones."  Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010).

Courts have explained how to determine whether the alleged sexually harassing conduct is sufficiently severe or pervasive to support a hostile work environment claim:

> To be actionable under Title VII, a hostile work environment must be both "objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. In considering these factors, [courts] employ a totality of the circumstances approach, instead of requiring proof of each factor individually.

Id. at 1247–48 (internal citations omitted).

In this case, Plaintiff has proffered evidence that Mayweather did the following: (1) he once stated to her that "he was going to fuck [her] with his big black dick where there weren't cameras;" (2) he called and texted her; (3) he called her "cutie" in texts; (4) he tried to talk to Plaintiff alone and in areas where there were no cameras; and (5) he made a comment to another employee about Plaintiff when she bent down to pick up her keys, stating something like, "'She better not drop them keys in front of me.'" This conduct, however, does not rise to the level of being sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment.

15

Plaintiff fails to provide sufficient detail as to the time period during which this conduct occurred and how frequently Mayweather called her, texted her, and tried to talk to her alone and in areas where there were no cameras.  Even assuming that Mayweather engaged in such conduct frequently, this conduct, considered as a whole, cannot be characterized as severe.  Plaintiff does not allege that Mayweather ever physically touched her, and she only alleges one instance of Mayweather making a vulgar statement directly to her.  Further, Plaintiff offered no evidence that Mayweather's conduct unreasonably interfered with her work performance.  Accordingly, the Court agrees with Defendant that Mayweather's conduct was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment.  See, e.g., Lockett v. Choice Hotels International, Inc., 315 Fed. Appx. 862 (11th Cir. 2009)(finding the following conduct not sufficiently severe or pervasive: the employee made sexual comments to the plaintiff frequently over several months, such as talking "about sexual positions, that he would lick her 'p-u-s-s-y', that 'he would go down on [her] good,' that her boyfriend 'ain't F'ing [her] right,' and that she needed 'to get with a real guy,'" as well as sticking his tongue out two or three times, trying once to hug her, and once touching her bottom quickly).  Thus, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claims.

**B.  Gender Discrimination**

Plaintiff asserts claims of gender discrimination based on her contention that Defendant treated male employees with suspended licenses more favorably than she was treated.  Defendant argues that Plaintiff cannot produce any evidence of Defendant giving more favorable treatment to any similarly situated male comparators.[7]  As explained below, the Court agrees with Defendant.

Plaintiff argues that she can prove gender discrimination under the burden-shifting framework set out in McDonnell Douglas.[8]  Courts evaluate claims under the McDonnell Douglas framework as follows:

> When proceeding under McDonnell Douglas, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination."

---

[7] Defendant also argues that Plaintiff was not qualified to perform her job once her license was suspended.  The Court need not reach this argument, because Plaintiff fails to show that she was treated less favorably than similarly situated male employees or otherwise offer any circumstantial evidence of gender discrimination.
[8] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1220–21 (11th Cir. 2019)(internal citations omitted).

Defendant argues that Plaintiff cannot make out a *prima facie* case, because she cannot produce any evidence that Defendant treated any similarly situated male comparators more favorably.  In order to be a proper comparator, Plaintiff "must show that she and her comparators are 'similarly situated in all material respects.'" Id. at 1226.  In general, similarly situated comparators: (1) will have engaged in the same basic conduct or misconduct as the plaintiff; (2) will have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) will ordinarily (although not invariably) have been under the same supervisor as the plaintiff; and (4) will share the plaintiff's employment or disciplinary history.  See id. at 1227-28 (citations omitted).  Such a showing is necessary before a comparison of Defendant's treatment of the other employees can give rise to an inference of unlawful discrimination.  See id. at 1225.

In this case, after Plaintiff's license was suspended and she had a BPO license, Herrera and Stewart required Plaintiff to sign a waiver and release in order for her to keep her job.  Plaintiff contends that two male Recreation Leaders, Franklin Gates and Vince Bowers, had suspended licenses, but they were not required to sign a waiver and release in order to keep their jobs.  However, these employees are not similarly situated to Plaintiff, because they had suspended

licenses in 2005 (Gates) and 2009 (Bowers), before Herrera and Stewart began working for Defendant, and thus, Herrera and Stewart were not the decisionmakers regarding Gates' and Bowers' continued employment with Defendant.[9]  The fact that one or more decisionmakers did not require Gates or Bowers to sign a waiver and release in order to keep their jobs when their licenses were suspended is not evidence that Herrera and Stewart's decision to require Plaintiff to sign a waiver and release in order to keep her job was based on her gender.  See Siddiqui v. NetJets Aviation, Inc., 773 Fed. Appx. 562, 564 (11th Cir. 2019)(stating that "differences in treatment of different comparators by different decisionmakers can rarely be the basis for a viable discrimination claim"); Hartwell v. Spencer, 792 Fed. Appx. 687, 694 (11th Cir. 2019)(finding, in a race discrimination case, that the white comparator was not similarly situated to the black plaintiff because the decisionmaker (Turner) that responded to the comparator's misconduct was not the same decisionmaker (Pfaff) that responded to the plaintiff's misconduct; court stated that it made "no sense to say that Turner's leniency towards [the white comparator] supports the allegation that Pfaff treated white [employees] differently" than the plaintiff).  Accordingly, the Court finds that Plaintiff has failed to present a *prima facie* case of discrimination.

---

[9] Stewart did not start working for Defendant until 2015.  (Doc. No. 15-1, depo. p. 32).  Herrera did not start working for Defendant until 2018.  (Doc. No. 15-2, depo. p. 13).

A plaintiff's failure to produce a comparator is not necessarily fatal to her claim if the plaintiff otherwise presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.  See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)(citations omitted). Plaintiff contends that the evidence before the Court satisfies this alternative method of showing discrimination.  The Court, however, rejects Plaintiff's argument that the evidence, construed in the light most favorable to her, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination against Plaintiff based on her gender.  Therefore, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claims.

## C.  Retaliation

Plaintiff contends that Defendant terminated her employment in retaliation for her complaining about Mayweather's sexual harassment and then complaining that Defendant undertook an inadequate investigation and failed to properly discipline Mayweather for his harassing conduct.  In order to succeed on her retaliation claims, Plaintiff must show three things: (1) that she engaged in statutorily protected activity; (2) the she suffered an adverse employment action; and (3) that the adverse employment action was causally related to her protected activity.  See Knox v. Roper Pump Co., 957 F.3d 1237, 1244 (11th Cir. 2020).  If

she makes such a showing, then she has established a *prima facie* case, and the burden shifts to Defendant to rebut the presumption that the adverse action was due to retaliation. See id. Defendant meets this burden of production by articulating a legitimate, non-discriminatory reason for the adverse action. See id. at 1245. If Defendant proffers a legitimate, non-discriminatory reason for the adverse action, the presumption of retaliation is eliminated, and the burden shifts back to Plaintiff to show that Defendant's proffered reason is pretextual. See id. To do this, Plaintiff must proffer evidence, including previously produced evidence, that would permit a reasonable jury to conclude that the reason proffered by Defendant for Plaintiff's termination was not the real reason, and instead, Plaintiff was terminated in retaliation for engaging in protected activity. See id.

Defendant does not dispute that Plaintiff engaged in protected activity when she complained of Mayweather's harassment on September 14, 2017 and that she suffered an adverse employment action when Defendant terminated her employment on September 20, 2019. However, Defendant argues that Plaintiff cannot show causation. Specifically, Defendant argues that the three-year gap between her sexual harassment complaint and her termination is too long to show that her termination was caused by her 2017 complaint. Additionally, Defendant argues that Plaintiff's car accident and resulting BPO license is a superseding

cause that breaks any chain of causation between Plaintiff's protected activity and her termination.

The Court agrees that Plaintiff's 2017 complaint and her 2020 termination, standing alone, do not raise an inference of retaliation. But that is not the entire basis for Plaintiff's retaliation claims. Plaintiff contacted HR and inquired about the status of her sexual harassment complaint in August of 2018 at a meeting that was attended by Herrera, Stewart, and an attorney from the county attorney's office. Plaintiff argues that this inquiry into her sexual harassment complaint and her resulting complaint regarding Defendant's investigation of her harassment complaint and the discipline given to Mayweather discussed at the 2018 meeting constitute protected activity. Neither Plaintiff nor Defendant cite to actual case law to support their positions regarding whether Plaintiff's inquiry and complaint during this 2018 meeting constitutes protected activity. The Court's limited research suggests that it may constitute protected activity. See Milner v, Lee County, Alabama, 2006 WL 1361147, at *10 (M.D. Ala. May 16, 2006)(stating that the plaintiff engaged in protected activity when she twice inquired about her sexual harassment complaint and when she complained that the investigation into her complaint was inadequate); Weston v. Pennsylvania, 251 F.3d 420, 430 (3d

Cir. 2001)[10](stating that the plaintiff's three inquiries into the status of her sexual harassment complaint were protected activities).

Plaintiff believes that because she complained about the handling of her sexual harassment complaint at the August 2018 meeting, Herrera and Stewart were angry and intended to retaliate against her.  Plaintiff believes that Herrera and Stewart used her car accident and suspended license, which occurred three months later on November 11, 2018, as an excuse to retaliate against her.  Specifically, Plaintiff contends that they used her suspended license as a means of forcing her to waive her claims of sexual harassment relating to Mayweather in exchange for her continued employment.  Thus, Plaintiff argues, her complaint about Mayweather's sexual harassment and her complaint about the way Defendant investigated it and disciplined Mayweather were causally connected to Defendant's insistence that she sign a waiver and release of those claims, which resulted in her termination when she refused.

In support of her argument, Plaintiff relies on Knox, in which the plaintiff was terminated for refusing to sign a waiver and release of his discrimination claim.  See Knox, 957 F.3d at 1243.  In Knox, the plaintiff was suspended for violence against a co-worker while the defendant investigated the violence

[10] Weston was overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

allegation.  See id. at 1240.  Shortly thereafter, the plaintiff complained that he was being discriminated against based on his race, because white employees that had violated the workplace violence policy were treated more favorably.  See id.

The defendant determined that the plaintiff had violated the workplace violence policy and told the plaintiff that he could keep his job if he completed anger management classes and signed a "Last Change Agreement" ("LCA") that included a release of all of his claims against the defendant, including Title VII claims.  See id. at 1240, 1242. The plaintiff would not sign the LCA with the release language and asked the defendant to remove the release language in the LCA.  See id. at 1240, 1243. The defendant refused to remove the release language, and the defendant's attorney stated to the plaintiff's attorney that "it would [be] foolish to allow [the plaintiff], after his . . . complaint, to return to work without signing a release only thereafter to have to defend itself against a baseless EEOC claim."  Id. at 1243.  Additionally, the defendant's attorney told the plaintiff's attorney that "'the release became an issue because [the plaintiff] made a claim of discrimination.'"  Id.  The plaintiff refused to sign the release, and the defendant fired the plaintiff.  See id.

The plaintiff sued the defendant for race discrimination and retaliation.  See id. at 1240. The district court granted summary judgment to the defendant, and the

plaintiff appealed.  See id.  As to the retaliation claim, the appellate court stated the

following:

> Our case law confirms that a plaintiff could establish a causal connection between the protected activity and termination when an employer responds to an employee's discrimination complaint by conditioning the employee's continued employment on a release of claims and then fires the employee for rejecting the release.
>
> *     *     *
>
> No one has disputed that [the plaintiff] was subject to termination for violating the workplace violence policy. The question, however, is not whether [the defendant] could have fired [the plaintiff] based on his violation of company policy, but rather whether [the defendant] would have fired [the plaintiff] in the absence of [the plaintiff's] protected activity. If [the defendant] would not have included the release but for [the plaintiff's] complaint, and if [the plaintiff] wouldn't have been fired but for his refusal to sign the release -- difficult evidentiary judgments that a jury must make after assessing the credibility of the witnesses -- then [the defendant] . . . unlawfully retaliated.

Id. at 1246.

Thus, based on Knox, Plaintiff may be able to establish a causal connection

between her protected activity and her termination if she shows that Defendant

responded to her protected activity by conditioning her continued employment on a

release of her claims and then fired her for refusing to sign the release.  In this

case, Defendant has a policy that requires that Plaintiff have a valid driver's

license, and the policy states that she could be subject to termination for having

only a BPO license.  But the question is not whether Defendant *could have* fired

Plaintiff for having a BPO license, but rather whether Defendant *would have* fired Plaintiff for having only a BPO license if she had not made a sexual harassment complaint and then complained about how it was handled.

Defendant argues that Plaintiff's 2017 sexual harassment complaint and 2018 follow-up inquiry were not related to the waiver and release, because Defendant did not ask Plaintiff to sign the waiver and release until August of 2019. Thus, Defendant argues, the large gap in time shows that the events are not related. However, following Defendant's logic, there is also a large gap in time between Plaintiff's November 2018 car accident and Defendant asking Plaintiff to sign the waiver and release in August of 2019. The Court finds that the relationship, if any, between Plaintiff's sexual harassment complaint and follow-up inquiry and Defendant's request that Plaintiff sign the waiver and release is a question of fact for the jury to decide.

Based on the record before the Court, there is a genuine issue of material fact as to whether Defendant would not have made Plaintiff sign the waiver and release but for her sexual harassment complaint and her complaint about how it was handled. There is evidence before the Court that Plaintiff would not have been fired on September 20, 2019 but for her refusal to sign the waiver and release. Thus, a genuine issue of material fact exists regarding whether Plaintiff can prove a *prima facie* case of retaliation.

Defendant contends that it has offered a legitimate, non-discriminatory reason for terminating Plaintiff—she had only a BPO license.  Plaintiff contends that Defendant's reason is pretext for retaliation, as Defendant allowed her to continue working with only a BPO license for more than ten months, and it would have continued to allow her to work with only a BPO license through November 20, 2019 had she signed the waiver and release. The Court finds that there is a genuine issue of material fact regarding whether Defendant's proffered reason for Plaintiff's termination is pretext for retaliation.  As such, the Court denies both parties' motions for summary judgment as to Plaintiff's retaliation claims.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)    Plaintiff's Motion for Summary Judgment (Doc. No. 15) is **DENIED**.

(2)    Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED** as to Plaintiff's gender discrimination claims and hostile work environment claims, but the motion is **DENIED** as to the Plaintiff's retaliation claims.

(3)    All pretrial motions, including all motions in limine, must be filed by *March 15, 2021*. Each party may file one motion in limine containing all of their arguments in a single document not to exceed 25 pages. Responses thereto must be filed by *March 29, 2021*.

27

(4)     The parties are directed to file their joint pretrial statement by ***April 2,***

***2021***.

DONE AND ORDERED at Tampa, Florida, this 1st day of March, 2021.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record